FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA   99 NOV 16 AM 10: 01
Southern Division

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| SIMON BRAXTON, | ) |
| Plaintiff, | ) |
| v. | ) CV: 98-P-2069-S |
| INTSEL SOUTHWEST LTD., | ) |
| Defendant. | ) |

ENTERED
NOV 16 1999

### Opinion

Before the Court is a Motion for Summary Judgment filed by Defendant Intsel Southwest Ltd. ("Intsel") on July 15, 1999. The matter was heard with oral argument at the October 1, 1999 motion docket.[1] For the reasons expressed below, Intsel's Motion for Summary Judgment is due to be granted in part and denied in part.

### Facts

Plaintiff Simon Braxton first began his employment with Defendant in 1991 as a warehouseman. In 1993, he became a full-time crane operator. Around December of 1997, Plaintiff asked Gene Bond, the Vice President of Southeastern Operations for Intsel, about promotions and how he could make more money at Intsel. Bond allegedly responded: "Chuck, I look at you as a defensive back, and a person in management position is a quarterback. And Chuck, you can't make a defensive back into a quarterback." Subsequent to this conversation, Intsel, under the direction of Gene Bond, hired Beau Hutchins, a white male, to fill a shipping and receiving position. According to Mr. Hutchins' application for employment, resume, and references, he had extensive prior experience in shipping and receiving for another employer, Schuler Steel Industries. Plaintiff has no experience in shipping and receiving and did not express any specific interest in filling the shipping and receiving position when Hutchins was hired.

After Hutchins was brought in by Gene Bond, Braxton thought about the comment which Bond had made to him and took it as racial. Thereafter, he filed a charge of discrimination with the EEOC on March 16, 1998, alleging that he was discriminated against based upon his race in that he was not considered for promotions. Less than three months later, Beau Hutchins left

---

[1] The Court also entertained oral argument at the October 1, 1999 motion docket on Plaintiff's Motion to Compel Responses to Production Requests and to Answer Deposition Questions and Plaintiff's Motion to Compel Designation of Additional Deponents under Rule 30(b)(6). These motions are now moot.

Intsel. Plaintiff testified that he made a request to Gene Bond to fill Hutchins' position. However, Plaintiff was told that experience was needed in the warehouse, and Bond testified that, due to the disarray in the shipping and receiving office following the departure of Hutchins, he again sought an individual with past experience in shipping and receiving to fill the position. Ultimately, Mitzi Hindman, a white female who had worked in shipping and receiving several years before Hutchins' employment, was appointed to fill the position. Plaintiff was then offered a position as the supervisor of a newly-created swing shift. This morning shift only operated for a few days until it was discontinued due to the injury of an employee and subsequent lack of personnel to staff the shift. While the parties dispute whether Plaintiff was asked to resume this position when the swing shift was reinstated, Jeff Calvert ultimately became the shift's supervisor.

In August of 1998, Jason Bishop, the Operations Superintendent at Intsel, announced that Dennis MaHarry had been awarded the position of Bay Foreman and that the Plaintiff would be joining Mitzi Hindman in the Shipping and Receiving office as soon as someone could be found to fill his position as a crane operator. Plaintiff was also told by Bishop that he could begin staying after work when he finished his duties early to learn about shipping and receiving. According to Intsel, Plaintiff was not considered for the position of bay foreman because he had expressed an interest in working in shipping and receiving and was scheduled to begin training for a new position in that area.

On or around October 27, 1998, a crane operator named Ken Jones told Jason Bishop that Plaintiff made the following statement to him while the two were in the bathroom: "when I snap, in here their [sic] going to be carrying bodys [sic] out in body bags. When I snap, I don't know who I [sic] going to get." The following morning, Bishop reported these statements to Neil Parsley, Intsel's acting Vice President for Operations. At the conclusion of his conversation with Bishop, Parsley called Derrick Shepard, the shop foreman, over and asked if he knew anything about the Plaintiff making threats of violence in the workplace. Shepard informed Bishop and Parsley that he understood that Dennis MaHarry and Ken Jones had stated that Braxton had made threats. Upon questioning from Parsley and Bishop, MaHarry reported that a few days before, when Braxton learned that Parsley was coming to town, he stated that "if anyone said anything to him out of the way…that the company will be needing a 'body bag.'" Subsequent to this conversation, Bond, Parsley, and Bishop questioned Jones and MaHarry about Braxton's statements. After confirming plaintiff's statements in these follow up interviews, Neil Parsley made the decision to terminate Braxton.

On August 14, 1998, Plaintiff commenced this Title VII[2] and § 1981 action against Intsel, alleging that Intsel unlawfully discriminated against him as to promotions and job assignments. Furthermore, Braxton alleges that he was retaliated against by Defendant on account of his having filed a charge of discrimination with the EEOC in March of 1998. On November 23, 1998,

---

[2]Defendant argues that Plaintiff's Title VII claims based on Intsel's failure to promote him to various positions are barred because the EEOC declined to investigate Plaintiff's charge due to the time at which it was filed. Nevertheless, because both Title VII and 42 U.S.C. § 1981 have the same requirements of proof and use the same analytical framework, Plaintiff's rights are essentially unaffected by Defendant's assertion.

Plaintiff amended his complaint to bring a claim for retaliatory discharge, alleging that his October 28, 1998 termination was in retaliation for his filing a charge of discrimination with the EEOC and this lawsuit. Plaintiff seeks declaratory, injunctive, compensatory, and punitive damages. On June 15, 1999, Defendant filed this motion for summary judgment.

## I. Braxton's Claims for Discriminatory Failure to Promote

In an promotional discrimination case under either Title VII or § 1981 where a plaintiff has offered direct evidence of discriminatory intent, the employer must prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent in order to defeat the claim. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). However, absent direct evidence of racial discrimination, the plaintiff must prove the following to establish a *prima facie* case of promotional discrimination: (1) he was a member of a protected class; (2) he sought and was qualified for a position that the employer was attempting to fill; (3) despite his qualifications, he was rejected; and (4) the employer either continued to seek applicants after the plaintiff's rejection or filled the position with a person outside of the plaintiff's protected class. *Walker v. Mortham*, 158 F.3d 1177, 1187 (11th Cir. 1998). To rebut the *prima facie* case, the defendant must advance a legitimate non-discriminatory reason that the plaintiff was rejected or the other applicant was chosen. *Id.* at 1192. Once the defendant has carried this burden, the initial presumption of intentional discrimination drops from the case, and plaintiff must offer evidence that defendant's proffered reasons are pretextual to survive summary judgment. *Id.* at 1184.

Braxton argues that he has provided direct evidence of discriminatory intent by pointing to the alleged statement made by Gene Bond, the Vice President of Southeastern Operations for Intsel, that Braxton was more cut out to be a "defensive back" than a "quarterback." This comment was made to Braxton in December of 1997, when Gene Bond was discussing with him the possibility of seeking a promotion. Nevertheless, despite Plaintiff's assertions, Bond's comment does not constitute direct evidence of a discriminatory intent on the part of Intsel with respect to the promotions involved in Plaintiff's allegations. "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard*, 161 F.3d at 1330. In this case, the statement attributed to Bond is a football analogy that, on its face, makes no reference to race. Any determination that this statement was a racist statement would require the trier of fact to make inferences about the statement. Indeed, the Plaintiff admits that he did not even take the statement to be racist until Beau Hutchins was hired to fill the shipping and receiving position, and he had "pondered on it a little while." As such, there is no direct evidence of a discriminatory intent behind the employment decisions made by Intsel in this case. Therefore, because Plaintiff possesses only circumstantial evidence of discrimination in this case, he must first establish a *prima facie* case of intentional discrimination to survive summary judgment. *See Walker*, 158 F.3d at 1183.

### A. The Shipping and Receiving Position

Plaintiff claims that he was unlawfully discriminated against on two different occasions regarding Defendant's failure to promote him to the shipping and receiving position. Plaintiff first argues that he was wrongfully denied the position when it was filled by Beau Hutchins in January of 1997. However, it is undisputed that prior to the time when Hutchins was hired, Plaintiff had expressed no specific interest in the shipping and receiving job. Plaintiff had only spoken briefly with Gene Bond about his desire for a promotion. Even if Plaintiff was able to establish that he sought the vacant shipping and receiving position, he still cannot make out a *prima facie* case because he was not qualified for the position. Gene Bond, when searching for a candidate to fill the position, sought an individual with prior experience in a similar position. While the Plaintiff had no prior experience in shipping and receiving, Beau Hutchins had extensive experience in shipping and receiving for another employer, Schuler Steel Industries.

Plaintiff also makes a discrimination claim based upon Intsel's failure to appoint him to the shipping and receiving position which Beau Hutchins vacated when he left Intsel in June of 1998. Nevertheless, once again, Braxton cannot make out a *prima facie* case because his lack of experience in shipping and receiving made him unqualified to fill the position. Gene Bond testified that he once again sought an employee to fill the position who had experience due to the disarray in the shipping and receiving office after Hutchins left. Ultimately, the position was given to Mitzi Hindman, who had performed the shipping and receiving duties prior to Hutchins' employment with Intsel.

Even if Braxton was able to prove that he both sought and was qualified for the shipping and receiving position on either occasion when the position was available, he still could not survive summary judgment in either instance because Intsel has offered a legitimate nondiscriminatory reason why the Plaintiff was not hired to fill these positions: more qualified applicants were hired. In each instance, Intsel sought to fill the shipping and receiving position with an individual with prior experience in shipping and receiving. The individuals hired to fill the positions had this experience, while Plaintiff did not. Essentially, Plaintiff has offered no evidence that the reasons provided by the Defendant in this instance are pretextual. Rather, Plaintiff relies on one statement made by Gene Bond as evidence calling into question the truthfulness of Defendant's statements. Because the Plaintiff has not presented sufficient evidence that Intsel's stated reasons for not promoting Braxton to the shipping and receiving position are pretext for unlawful discrimination, summary judgment is appropriate on any claims relating to that position.

### B. The Bay Foreman Position

Plaintiff also claims that he was denied consideration for the bay foreman position that was ultimately awarded to Dennis MaHarry. Assuming that Plaintiff could make out a *prima facie* case, his claim with respect to the bay foreman position still cannot survive. Intsel has offered a legitimate non-discriminatory reason for not promoting Braxton to the position. At the time MaHarry was given the bay foreman position, it was also announced that Braxton would be trained to work in the shipping and receiving office. Plaintiff had previously expressed interest in a position in the shipping and receiving office, a move which would remove him from Bay One,

the bay for which MaHarry became foreman. Therefore, according to Defendant, Braxton was not considered for the bay foreman position because he was to begin training for this new position. Because Plaintiff has not offered any substantial evidence from which a reasonable jury could conclude that Defendant's proffered reason was pretextual, summary judgment is appropriate with respect to this claim.

C. The Promotions of Jeff Calvert

In both his EEOC claim and in his complaint, Plaintiff makes reference to promotions given to Jeff Calvert which he believes that he should have received. However, Braxton's deposition testimony suggests that his real allegations with respect to Jeff Calvert are centered on Calvert's appointment to the position of swing shift supervisor in August of 1998.[3] Braxton had previously held the position of swing shift supervisor until the shift was discontinued when an employee was injured. Defendant claims that when the shift was reinstated, Calvert volunteered to fill the position because no one else, including the Plaintiff, was interested in accepting the position. Plaintiff disputes that he was ever offered the position following the reinstatement of the shift. Nevertheless, by awarding Plaintiff the position of supervisor when the swing shift was first created, Defendant acknowledged his qualifications for the job. Because a genuine dispute exists as to whether Plaintiff sought and was offered the position, summary judgment is not appropriate at this time on Plaintiff's promotion claim with respect to the swing shift.

II. Braxton's Claim for Retaliatory Discharge

On November 23, 1998, Plaintiff amended his complaint to bring a claim of retaliatory discharge, alleging that his October 28, 1998 termination by Intsel was in retaliation for his filing a charge of discrimination with the EEOC and/or his bringing this lawsuit. In order to establish a *prima facie* case on a retaliation claim, a plaintiff such as Braxton must show that 1.) he engaged in a statutorily protected activity; 2.) his employer took an adverse employment action against him; and 3.) there is a causal connection between the protected activity and the adverse action. *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998). Once a *prima facie* case is established, an inference is raised that discriminatory intent motivated the adverse employment action, and the burden shifts to the employer to articulate a "legitimate non-discriminatory reason" for the adverse action. *Id.* at 702. Once the employer's burden is satisfied, the burden shifts back to the plaintiff to show that the defendant's proffered reason is pretextual. *Id.*

---

[3] To the extent that Plaintiff alleges that Calvert's promotion to the position of Bay Foreman in 1993 was a result of Intsel's intentional discrimination, his claim is barred by the statute of limitations. To the extent that Plaintiff alleges that Calvert's promotion to the position of dispatcher in 1997 constituted intentional discrimination, his claim fails because Plaintiff has offered no evidence that he possessed the requisite qualifications to fill the position or that the proffered reason for appointing Calvert to the position was pretextual. Calvert was promoted to the position of dispatcher on the recommendation of Steve Holley, the operations manager at that time. Calvert had previously been employed as a bay foreman and was familiar with bills of lading and tickets used in the dispatcher position. Plaintiff had no such experience.

In the present case, Intsel is entitled to summary judgment because Braxton cannot establish a *prima facie* case for retaliation. More specifically, the Plaintiff has not presented substantial evidence of a causal connection between Braxton's complaint to the EEOC and subsequent lawsuit and his termination. Braxton was terminated approximately eight months after filing his EEOC charge and approximately three months after this lawsuit was filed. While the adverse employment action complained of did occur after Plaintiff engaged in protected activity, the timing of the adverse employment decision and the plaintiff's complaints is only one factor among the total circumstances to be taken into account when making a determination about whether a causal relation exists. *See Booth v. Birmingham News Co.*, 704 F. Supp. 213, 215-16 (N.D. Ala. 1988) *aff'd*, 864 F.2d 793 (11th Cir. 1988). In the present case, it is apparent that an intervening factor occurred during the time period after Braxton's protected complaints and before his termination that led to his dismissal in October of 1998. Braxton was terminated after it was reported to Intsel's management by two of his co-employees that he had threatened violence in the workplace, in violation of company policy. Ken Jones and Dennis MaHarry reported to Gene Bond, Neil Parsley, and Jason Bishop that Braxton had made threats that the company would need "body bags" if anyone messed with him or if he snapped. The report of these statements is what led to Neil Parsley's decision to terminate Braxton's employment with Intsel on October 28, 1999. Therefore, the plaintiff cannot present substantial evidence of a causal relation between Braxton's protected activity and his termination, making summary judgment appropriate.

Even assuming that Plaintiff could make out a *prima facie* case for retaliation, summary judgment would still be appropriate because Plaintiff has not presented any significant evidence that Intsel's stated reason for firing Braxton was pretextual. In response to Defendant's proffered reason that the Plaintiff was fired for violating Intsel's anti-violence policy, Plaintiff has attempted to establish pretext by pointing to various inconsistencies in Defendant's witnesses' testimony. Specifically, Plaintiff has cited inconsistencies concerning the times that various interviews concerning Plaintiff's alleged "body bags" statement were made. Plaintiff has also attempted to cast doubt on the credibility of Jason Bishop, the supervisor to whom Ken Jones first reported the "body bags" statement, by noting that Bishop did not document Jones' report about Braxton, kept certain employee files on his home computer, and allegedly sided with another employee in a dispute between Braxton and the employee. Despite Plaintiff's suggestions, it is undisputed that both Dennis MaHarry and Ken Jones each told Gene Bond, Jason Bishop, and Neil Parsley in separate interviews that Plaintiff made a threatening statement that included the words "body bags." Braxton has admitted that the statement, if made, would have constituted a threat of violence warranting termination under Intsel's anti-violence policy. Furthermore, it is undisputed that the decision to terminate Braxton was made by Neil Parsley after he personally interviewed the two employees to whom Braxton had allegedly made threats of violence. Even taking Braxton's assertion that he did not make the "body bags" statements to be true, Intsel is still not liable for retaliatory discharge if it acted on the belief that Braxton had violated company policy. *See Jeffries v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980). Because Plaintiff has offered no real evidence to suggest that Parsley did not act on such a belief when he fired Braxton, summary judgment is due to be granted on the retaliatory discharge claim.

### III. Braxton's Retaliation Claims

Braxton has also brought a claim for retaliation which alleges that he was not reappointed to supervise the swing shift in retaliation for filing his EEOC claim. However, after Braxton had filed his EEOC charge on March 16, 1998, Gene Bond appointed Braxton supervisor of the swing shift when the position was first created. Even assuming Braxton's allegation to be true that he was not offered the position again when the swing shift was resumed, Plaintiff cannot establish a causal relation between the filing of his charge and any decision not to reappoint him to the position of supervisor because both decisions were made by Gene Bond *after Braxton filed his charge*. A permissible inference arises that no discriminatory animus motivated the employer's decision if the same actor was in charge of a plaintiff's promotion and the adverse employment decision. *Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998). As such, summary judgment is appropriate on Plaintiff's retaliation claim as it relates to the swing shift supervisor position. To the extent that Plaintiff claims that any of the other complained of promotions were denied him because of the filing of his EEOC charge, those claims also fail because, as aforementioned, he has not presented sufficient evidence that Defendant's proffered reasons for denying him the promotions were pretextual.

### IV. Braxton's Claim Relating to the Denial of a Company Loan

Braxton also claims that he was denied a company loan based upon his race. Specifically, he claims that in 1996 or 1997 he asked Gene Bond for a loan in order to pay for repairs to his car. According to the Plaintiff, Bond responded by telling him that the company did not give loans. Braxton's claim for disparate treatment is based upon evidence that while he was denied a loan, Dennis MaHarry, a white employee, received two company loans. While there is a dispute over whether Plaintiff indeed asked Gene Bond for a loan, it is undisputed that both black and white employees at Intsel have received loans from the company. Bond testified that in order to acquire a company loan, an employee fills out paperwork and the request is sent to the Houston office. Plaintiff never made such a request. As such, summary judgment is due to be granted on Plaintiff's claim.

### V. Conclusion

For above reasons, Defendant Intsel's Motion for Summary Judgment is due to be granted in part and denied in part. Plaintiff's only surviving claim is his claim for discriminatory failure to promote with respect to the swing shift supervisor position.

Dated: Nov. 16, 1999

Chief Judge Sam C. Pointer, Jr.